1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

9   SILVIA TREVINO,                        CASE NO. 1:10-cv-01485-SMS

10              Plaintiff,

11     v.                           ORDER AFFIRMING AGENCY'S
DENIAL OF BENEFITS AND ORDERING
JUDGMENT FOR COMMISSIONER

12   MICHAEL J. ASTRUE,
Commissioner of Social Security,

13

14             Defendant.

_____/

15
16        Plaintiff Silvia Trevino, by her attorneys, Christenson Law Firm, seeks judicial review of
17   the final decision of the Commissioner of Social Security ("Commissioner") denying her
18   application for disability insurance benefits under Title II of the Social Security Act (42 U.S.C. §
19   301 *et seq.)* (the "Act") and for supplemental security income  ("SSI"), pursuant to Title XVI of
20   the Act.  The matter is currently before the Court on the parties' cross-briefs, which were
21   submitted, without oral argument, to the Honorable Sandra M. Snyder, United States Magistrate
22   Judge.  Following review of the record as a whole and applicable law, this Court affirms the
23   agency's determination to deny benefits to Plaintiff.

## I.   Administrative Record

### A.   Procedural History

Plaintiff was insured under the Act through December 31, 2008.  On May 12, 2004,
Plaintiff filed for disability insurance benefits, alleging disability beginning March 13, 2003.  Her
claim was denied initially on December 7, 2004, and upon reconsideration on May 10, 2005.  On

June 15, 2005, Plaintiff timely requested an administrative hearing. Plaintiff appeared and testified at a hearing on August 7, 2006. Supplementary hearings were held on November 16, 2006, and March 7, 2007. On March 12, 2007, Administrative Law Judge James P. Berry denied Plaintiff's application. Plaintiff appealed to the Administrative Council.

While the appeal was pending, Plaintiff filed a new application for both disability insurance benefits and SSI.

On September 12, 2007, the Appeals Council vacated the hearing decision and remanded to the ALJ, directing him to give further consideration to treating and examining source opinions; to obtain additional evidence regarding Plaintiff's physical and mental impairments, including a consultative examination and medical expert testimony if warranted; and to obtain medical expert testimony if necessary to clarify the nature and severity of Plaintiff's impairments.

Plaintiff appeared and testified at a hearing on September 15, 2008. On December 8, 2008, Judge Berry again denied Plaintiff's application. The hearing decision incorporated both of Plaintiff's applications for benefits. Plaintiff appealed to the Administrative Council, which denied review on June 30, 2010. On August 17, 2010, Plaintiff filed her District Court complaint.

### B.     Agency Record

Plaintiff (born August 20, 1972) is a high school graduate and has completed two years of college. Having completed a certification program, she was previously employed as a certified nursing assistant. While this application was pending, Plaintiff attended Porterville College from Spring 2007 through Fall 2008.

At the time she was injured, Plaintiff was working two full-time jobs: psychiatric technician at Porterville Developmental Center and certified nurse assistant at Gaithers Home Care, a nursing home serving severely disabled elderly patients. In her job at the development center, she worked with individuals who had been judged mentally incompetent to stand trial.

Plaintiff was injured on March 13, 2003, while she tried to break up a fight between two developmental center residents. A large resident approached Plaintiff from behind and pulled her backward by her hair, causing Plaintiff to experience neck and back pain and shortness of breath. She was initially treated by a physician at the developmental center and subsequently by an

occupational physician.  On March 25, 2003, while resting at home, Plaintiff experienced a drop in blood pressure and a seizure, possibly as a reaction to the medication.[1]  Plaintiff was stabilized by paramedics, then transferred for treatment at Sierra View Hospital.

While she recovered, Plaintiff received care from family members.  Her father and brother paid her mortgage after she was injured.  Since Plaintiff is a single mother, her three daughters were temporarily placed in the custody of their respective fathers.[2]  Plaintiff's workers' compensation claim was resolved February 28, 2005, for a lump sum payment of $38,850.00.

According to Plaintiff's account to Andrew Whyman, M.D., following her seizure, Plaintiff suspected malpractice by the workers' compensation doctor.  She retained an attorney, who referred her to Dr. Wlasichuk.

**Treatment at Porterville Developmental Center.**  Following the assault, C. Pugh, F.N.P., observed that Plaintiff had a headache and severe cervical (neck) pain.  Although Plaintiff was alert and responsive, she slept in a chair until a family member arrived to take her home.  Pugh diagnosed cervical strain with cephalalgia (headache), and referred Plaintiff to Valley Promptcare Medical Corp. for treatment.

**Dr. James.**  Dwight James, M.D., a physician at Valley Promptcare, treated Plaintiff until she suffered a seizure on March 24, 2003.  After x-rays indicated a normal cervical spine, James diagnosed cervical sprain and a headache.  Plaintiff's neck was tender from C3-C6.  Her range of motion on March 14, 2003 was flexion, 30-90°; extension, 20/30°; right rotation, 30/45°; and left rotations 40/45°.[3]  Initially, James directed Plaintiff to remain off work until March 19, 2003; later, he extended the recommended absence to March 28, 2003.

**Sierra View District Hospital.**  After Plaintiff suffered a seizure on March 24, 2003, she was taken by ambulance for treatment at Sierra View District Hospital.  Frank S. Cavallaro, M.D.,

---

[1]  Various sources within the agency record report different dates for Plaintiff's seizure.

[2]  Each of Plaintiff's three daughters has a different father.

[3]  Normal ranges of neck motion are flexion (touch chin to sternum), 70-90°; extension (pointing chin up), 55 °; lateral bending (bring ear toward shoulder), 35°; and rotation (70 ° left and right).  web.mit.edu/tkd/stretch/stretching_8.html (October 20, 2011).

1   reviewed x-rays of Plaintiff's cervical spine.  He found the vertebral body heights and disc space

2   heights were maintained, with no evidence of fracture or subluxation.  No prevertebral or

3   paraspinal soft tissue mass was observed.  There were no significant arthritic changes.

4        Thomas W. McClennan, M.D., evaluated Plaintiff's brain scan on March 25, 2003, and

5   reported that there was no intracranial hemorrhage, mass or infarct.  McClennan also evaluated a

6   MRI of Plaintiff's cervical spine, which revealed slight widening of the disc space at T2-3 and

7   mild cervical disc protrusion at C5-6.  He observed no enlargement, contusion or edema of the

8   cervical cord, nor did the slight disc protrusion at C5-6 impinge on the spinal cord.

9        On March 28, 2003, Godofredo R. Celis, M.D., opined that Plaintiff had experienced a

10  generalized tonic-clonic seizure due to postural hypotension.  Her EEG was abnormal, revealing a

11  7 to 8 cycle per second background indicative of diffuse cerebral dysfunction and generalized 20

12  to 25 cycle per second waves.  Celis suggested these may have been related to Plaintiff's drug

13  intake.

14       The agency records include documentation of numerous visits to the emergency room at

15  Sierra Vista Hospital, including October 10, 2004, chronic back pain and epigastric pain;

16  December 22, 2004, seizure; February 6, 2005, seizure; February 11, 2005, back pain following

17  auto accident; March 21, 2005, chest pain and shortness of breath; and April 26, 2005, headache

18  with dizziness and numbness of hands.

19       **Dr. Wlasichuk.**[4]  Following her seizure, Plaintiff's attorney referred her to Michael

20  Wlasichuk, M.D., a physical medicine and rehabilitation specialist. In a treating physician's

21  progress report for workers' compensation dated April 30, 2003, Wlasichuk's objective findings

22  included cervical sprain, diffuse spasm and tenderness, and limitation of spinal movement to 15°,

23

24

25

26

27

28
      [4]  The agency record also includes Wlasichuk's handwritten treatment notes.  Because of the poor copy
      quality and Wlasichuk's indecipherable handwriting, the Court was not able to fully consider those treatment notes.

rotation to 15°, and lateral bends to 15°.  Wlasichuk prescribed Zonegran,[5] Flexeril,[6] and Darvocet.[7]  He instructed Plaintiff to remain off work until June 1, 2003.

Beginning May 7, 2003, Plaintiff complained of headaches.  Her movement was reduced to neck flexion/extension, 15°; rotation, 10°; and lateral bends, 10°.  Wlasichuk added prescriptions for Biofreeze[8] and Lidoderm Patch.[9]  He directed Plaintiff to continue therapy and directed her not to return to work until July 1, 2003.

On June 16, 2003, Wlasichuk noted that Plaintiff was still wearing her cervical collar and had limited neck movement due to pain.  Wlasichuk directed Plaintiff to wean herself from the cervical collar and to continue therapy.  He directed Plaintiff to remain off work until August 1, 2003.

At her July 16, 2003 appointment, Plaintiff reported that she could take off the neck brace for twenty minutes every two hours.  Plaintiff reported that therapy was helping her to move her neck: Wlasichuk noted Plaintiff was capable of flexion, 20°; extension, 10°; rotation, 10°; and lateral bends, 10°.  He directed Plaintiff to continue physical therapy and not to return to work until September 1, 2003.  Wlasichuk added reactive depression to Plaintiff's diagnoses and

---

[5]  Zonegran is prescribed to treat seizure disorders.  Possible side effects include drowsiness, weight loss, constipation, dry mouth, dizziness, headache, nausea, vomiting, heartburn, diarrhea, restlessness, trouble sleeping, and irritability.  (Plaintiff includes information sheets for some of her medications at AR 413-18.)

[6]  Flexeril relaxes muscles.  It is prescribed to decrease muscle pain and spasms.  Possible side effects include drowsiness, dry mouth, fatigue, dizziness, lightheadedness, constipation, or blurred vision.

[7]  Darvocet (acetaminophen and propoxyphene) is a combination of narcotic and non-narcotic pain relievers prescribed to relieve mild to moderate pain.  Possible side effects include nausea, vomiting, constipation, lightheadedness, dizziness, drowsiness, headache, or vision changes.

[8]  Biofreeze is a topical pain reliever.  www.biofreeze.com (October 20, 2011).

[9]  The Lidoderm patch (5% lidocaine) is a local anesthetic.  www.drugs.com/cdi/lidoderm-patch.html (October 20, 2011).

prescribed Effexor[10] and Xanax.[11] He directed Plaintiff to continue psychotherapy with Dr. Borrego.

On August 15, 2003, Plaintiff complained of daily headaches, pain, spasms, and an inability to move her neck fully.  Wlasichuk noted 15° rotation and 15° lateral bends.  Plaintiff was not to return to work until October 1, 2003.

At her appointment on October 10, 2003, Plaintiff's depression was not fully controlled, and she was crying easily.  Moving her neck was painful.  Rotation, bending, flexion, and extension were limited.  Wlasichuk told Plaintiff not to return to work until January 2, 2004.

On October 22, 2003, Plaintiff's movement had increased to rotation, 25°; lateral bends, 25°; flexion, 25°; and extension, 20°.  On December 24, 2003, Wlasichuk added a prescription for Elavil[12] and directed Plaintiff to remain off work until February 1, 2004.

On January 29, 2004, Plaintiff's flexion was 20°; extension, 15°; rotation, 20°; and bends, 10°.  Wlasichuk directed Plaintiff not to return to work until March 15, 2004.

For the first time in March 2004,[13] Wlasichuk noted that Plaintiff would require vocational rehabilitation.  Plaintiff reported that she was not wearing the cervical collar except on rare occasions.  She had full range of motion in her shoulders; flexion, 25°; extension, 15°; rotation, 3_° (*second digit indecipherable*), left and 25°, right; and bends, 25°.  On March 17, 2004, Plaintiff saw Wlasichuk after the prior day's examination in Oakland left her neck sore and swollen.  On April 1, 2004, Plaintiff's neck remained sore and swollen.

---

[10]  Effexor is an antidepressant (serotonin-norepinephrine reuptake inhibitor) used to treat depression and anxiety disorders.  Possible side effects include dizziness, nausea, trouble sleeping, nervousness, sweating, loss of appetite, dry mouth, tremor, blurred vision, constipation, drowsiness, changes in sexual activity, and anxiety.  Additional serious side effects include irregular heartbeat, chest pain, severe headache, painful or difficult urination, muscle cramping, unusual mental changes, and seizures.

[11]  Xanax (alprozolam) is used to treat anxiety and panic disorders.  Possible side effects include drowsiness and dizziness.

[12]  Elavil (amitiptyline) is used to treat depression and obsessive-compulsive disorders.  Possible side effects include drowsiness, dizziness, increased sun sensitivity, and blurred vision.

[13]  Portions of the progress report are too faint to read confidently.

On May 3, 2004, Wlasichuk directed Plaintiff to remain out of work until June 1, 2004. Although her neck remained sore, Plaintiff was walking well and was not using the cervical collar. Passive rotation was 20°; bends, 15°; extension, 15°; and flexion, 20°. Plaintiff was not crying, but displayed flat affect.

**Porterville Health Care Center.**  Records from May 1, 2003, through June 25, 2004, reflect Plaintiff's routine gynecological care.  The notes include no reference to Plaintiff's back or neck injuries or to any ongoing physical impairment.  On October 13, 2003, Alfonso Lupian, P.A.C., noted, "Patient appears in no acute distress."  AR 301.

**Dr. Klein.**  On March 16, 2004, psychologist Sandra H. Klein, Ph.D., prepared a pain and behavioral health report.  After administering and analyzing the Pain Patient Profile, Klein determined that Plaintiff's depression, anxiety, and somatization were above average when compared both to other pain patients and to community subjects.  On the Millon Behavioral Health Inventory, Plaintiff's scores were average on scales measuring chronic tension, recent stress, and social alienation.  Her scores were above average on scales measuring premorbid pessimism, future despair, somatic anxiety, and poor response to pain treatment.  Klein concluded that psychological factors were severely affecting Plaintiff's pain behavior and response to treatment.  On a one-to-five scale of the likelihood of a successful outcome from surgical or other traditional medical intervention, the test scores rated Plaintiff as 5, which represents the poorest candidate for such treatment.

**Dr. Newton.**  On April 8, 2004, neurologist Frederic H. Newton, M.D., an Agreed Medical Examiner in Plaintiff's workers' compensation case, prepared a report of his neurologic evaluation of Plaintiff on March 16, 2004.  Newton observed that Plaintiff's clinical presentation was significantly influenced by psycho-social and "characterological" factors.  Although he emphasized that Plaintiff's condition was not "in her head," her symptoms were fueled by her emotions.  Plaintiff, said Newton, was focused on her somatic symptoms and her perception of her impairment.  Newton considered Plaintiff's psychiatric problems to be significant and recommended an evaluation by a mental health specialist.

///

Newton determined that Plaintiff 's condition was permanent and stationary for workers' compensation purposes.  Her disability included an about-one-third reduction in spinal motion with constant slight pain and slight/moderate headache.  Plaintiff's pain could become moderate following heavy work.  She could not perform heavy lifting or repeated flexion/extension movements of her cervical spine.

Newton opined that Plaintiff's continuing medical care would require continued reassurance, support, and encouragement; occasional physical therapy; and three to four annual doctor visits for medication monitoring.  Plaintiff could not return to her prior work but was a candidate for vocational rehabilitation.

**Dr. Wlasichuk.**  Beginning on June 1, 2004, Wlasichuk's progress reports no longer directed Plaintiff to remain off work.  He observed that Plaintiff was less depressed.  She demonstrated full flexion; rotation, 25°; and bends, 20°.

**Dr. Whyman.**  On June 28, 2004, psychiatrist Andrew D. Whyman, M.D., reported on his agreed medical examination of Plaintiff on June 9, 2004, which was submitted as part of her workers' compensation claim.  Plaintiff complained of head and neck pain, pointing out "what she call[ed] a big bump on her neck."  AR 322.  Her daily headaches lasted at least three hours and blurred her vision.  She reported dry mouth, cold sweats, and upper back pain.

Psychologically, the first four months after the assault had been the worst, said Plaintiff, describing pain, irritability, anger, seclusion, and suicidal thoughts.  The pain, combined with the loss of her career and her ability to manage her life, had made her depressed and angry. Plaintiff believed that her condition had improved thereafter, but had now leveled off, so that she would never be any better than she felt.  In his summary, Whyman noted that Plaintiff's account of her adjustment after her injuries was "modestly compromised," including elements of repression and denial.

At the time of the interview, Plaintiff reported poor sleep, dreams in which she relived the assault, unwillingness to have people around her, a dislike of anyone touching her hair, and weight gain.  On the other hand, for the first time in her life, she was able to spend time at home and actually enjoy it.  "[S]he add[ed] quickly that she does not like to go out and so she stays

home a lot and she is afraid of crowds and doesn't want to go into Walmart because of the crowds." AR 323.  Although Plaintiff reported that her depression returned when she was told she could not return to her former job, Whyman questioned whether she had ever intended to return to her job.

Plaintiff described her daily activities as beginning at 7:00 a.m., when she awoke to get her children ready for school.  She took her medication, which Glover had previously set out for her. (Glover, who worked third shift, slept in the early part of the day.)  Because the school was nearby, the children walked there by themselves.  Plaintiff did laundry and ate breakfast.  Because of her pain, she spent a lot of time lying down, watching television or staring out the window. After Glover awoke, he would encourage her to get out of the house.  At about 3:30 p.m., the children returned from school.  Plaintiff supervised school work and the children's swim in the pool.  The children spent the weekends with their respective fathers.

Although Plaintiff's extended family lived nearby, Plaintiff told Whyman that they were not close, and she only saw them about once a month.  Plaintiff said that her family helped her after her injury only "because that was expected of them."  AR 324.  At another point in the interview, Plaintiff described her parents as "negative and stupid."  AR 327.

Plaintiff had significant financial problems but did not expect to be able to work for a long time.  Plaintiff "ma[de] it clear that she [was] not about to take some low-paying job."  AR 323.

Whyman observed no thought disorder or cognitive disruption.  Although Plaintiff was generally composed, she demonstrated undercurrents of emotionality and anger.  Plaintiff worked diligently on the psychological testing, which was interpreted by Dr. Zampardi.  Whyman commented:

> The profile reveals an exaggerated response set.  The MMPI clearly indicates an overemphasis on emotional problems and other tests were also in the extreme range, inconsistent with the clinical assessment.

AR 328.

In his summary, Whyman opined that, as a result of her injury, Plaintiff had "developed a quite substantial reactive emotional syndrome, either a significant and severe Adjustment Disorder or a Major Depressive Disorder."  AR 329.  Although subsequent treatment improved

her condition, Whyman opined that, as a result of the assault, Plaintiff experienced psychiatric injury lasting for at least four to six months after her injury and more probably eight to ten months after her injuries.  Her condition had stabilized by the time of Whyman's examination.

The testing administered in the course of Whyman's examination revealed symptom augmentation.  Plaintiff demonstrated a pain disorder, in which her subjective complaints far exceeded objective findings.  According to Whyman, Plaintiff's pain syndrome was attributable to psychological factors, perhaps primary or secondary gain.[14]  Whyman cautioned the reader of his report to carefully distinguish Plaintiff's psychiatric disability from secondary gain in the form of the emotional and financial support that Plaintiff acquired from Glover's moving in to care for her.

Whyman opined that, as a result of the emotional repercussions of her injuries, Plaintiff would likely not return to her prior job.  "She is capable of commencing vocational rehabilitation," stated Whyman, "and should be encouraged to do so."  AR 332.

**Dr. Zampardi.**  Psychologist Tara Zampardi, Ph.D., performed a "blind" personality assessment, that is, an analysis of Plaintiff's psychiatric test results without the knowledge of Plaintiff's history or a clinical interview.  Zampardi scored the Minnesota Multiphasic Personality Inventory-2 (MMPI-2), Shipley-Hartford Scale, Beck Depression Inventory (2nd edition), Wahler Physical Symptom Inventory, and Incomplete Sentences Blank, which Whyman had administered to Plaintiff.

Validity testing of Plaintiff's "F minus K" profile on the MMPI-2 yielded strong reasons to doubt the validity of the test results, suggesting a "fake bad" profile, that is, Plaintiff's over-reporting of the extent and severity of her psychological problems.  If the profile were treated as accurate, Plaintiff would be either "floridly psychotic or severely disorganized," either of which

---

[14]  Secondary, or epinosic, gain is the "[s]econdary advantages accruing from an illness, such as gratification of dependency yearnings or attention seeking. 'In the traumatic neuroses, *secondary gains* play an even more important role than in psychoneuroses; there are certain uses the patient can make of his illness which have nothing to do with the origin of neurosis but which may attain the utmost practical importance . . . . Obtaining financial compensation or fighting for one creates a poor atmosphere for psychotherapy, the more so if the compensation brings not only rational advantages but has acquired the unconscious meaning of love and protecting security as well.'" Campbell's Psychiatric Dictionary, 9th ed., at 343-44 (Oxford University Press 2009), *quoting* Fenichel, O., *The Psychoanalytic Theory of Neurosis* (1945).

1 would have been apparent to Whyman in his interview.  Similarly, Plaintiff's elevated score on

2 the FKB scale, also suggested a fake bad profile, that is, an exaggeration of emotional distress.

3 Accordingly, Zampardi opined that it was unlikely that the clinical profile obtained on the MMPI-

4 2 accurately represented Plaintiff's emotional status.

5        Plaintiff's score on the Beck Depression Inventory indicated that she was within the severe

6 range of depression.  Her scores indicated "high levels of hopelessness about the future; medium

7 levels of sadness, getting little pleasure from things previously enjoyed, guilt feelings,

8 disappointment in herself, feelings of agitation and irritability, difficulty making decisions, feeling

9 worthless, lack of energy to do much, difficulty with concentration, fatigue and decreased libido;

10 low levels of feelings that she may be punished, self-criticalness, suicidal thoughts without intent,

11 crying more than usual, and sleeping and eating more than usual."  AR 335-36.  Zampardi

12 cautioned, however, that the Beck was a poor measure without a clinical interview and was highly

13 susceptible to intentional or unintentional distortion.

14        Plaintiff's results on the Walther Physical Symptom Inventory placed her within the top

15 ten percent compared to other females in the normative sample.  According to Plaintiff, nearly

16 every day she experienced nausea, headaches, neck aches or pains, feeling hot or cold regardless

17 of the weather, difficulty sleeping, backaches, intestinal or stomach trouble, trouble with eyes or

18 vision, feeling tired, muscular weakness, dizzy spells, muscular tension, twitching muscles, poor

19 health in general, and weight gain.  Plaintiff's score suggest a considerable emphasis in physical

20 complaints and a high level of somatization.  Persons with somatizing tendencies tend to express

21 their psychological and emotional difficulties through physical complaints that are not easily

22 susceptible to treatment.

23        The Shipley-Hartford Scale estimates an individual's intellectual functioning.  Plaintiff

24 scored within the average range.  Plaintiff's responses to incomplete sentences indicated a focus

25 on pain, physical complaints, and emotional discomfort.

26        Zampardi summarized: "Testing suggests that there is significant emphasis on physical

27 problems and concerns including pain and disability.  Although actual and significant physical

28 ///

problems may be present, those scoring as [Plaintiff did] may show a tendency of overreacting to minor physical dysfunctions." AR 336.

**Dr. Wlasichuk.** On July 1, 2004, Plaintiff told Wlasichuk that she was exercising at home but experienced pain when she reached overhead. She was having headaches only three times weekly. Her anxiety and depression were more controlled.

On August 11, 2004, Plaintiff was severely depressed. Wlasichuk referred her to a psychiatrist, Dr. Dellanos, for management of psych meds. On September 27, 2004, Wlasichuk noted gradual, but slow, improvement of neck movement. He began to note Plaintiff's height (5'4"), weight (212 pounds), and blood pressure (104/72) on the progress reports. On November 10, 2004, Plaintiff began to refuse to be weighed.[15]

**Dr. Borrego.** Plaintiff received psychotherapy from Rudolfo Borrego, D.S.W., L.C.S.W. For the most part, Borrego's treatment notes are repetitive, generalized, and conclusory one-paragraph summaries of Plaintiff's condition. Their lack of detail provides little insight into Plaintiff's condition and treatment. Plaintiff complained of depression, symptoms of post traumatic stress disorder, and pain syndrome, and received individual psychotherapy, supportive therapy, and stress management. Plaintiff attributed her depression to her physical pain. She grieved the loss of her health, ability to work, and lifestyle. Borrego reported that Plaintiff experienced panic attacks and had required hospital emergency treatment for panic.

Prior to her July 13, 2004 appointment, Plaintiff experienced an emotional set back when physical therapy was terminated.

On November 19, 2004, Borrego completed a claim form for Beneficial Finance on which he indicated that Plaintiff was not expected to return to any employment. Borrego opined that Plaintiff was not a candidate for vocational rehabilitation.

///

---

[15] Plaintiff's need to determine her own medical treatment and her disregard of medical authority is apparent throughout the agency record. For example, she refused Dr. Saul's attempts to modify the medications that she took for depression and anxiety. Similarly, in the hospital emergency room, she refused to permit a urine test, declined the services of a physician's assistant, and demanded the physician of her choice. In the course of treatment on April 26, 2005, Plaintiff removed her own IV and left the emergency room without having been discharged.

In an undated progress report, Borrego reported that, although Plaintiff continued to require treatment, he stopped providing it to her when workers' compensation stopped paying for it.

**Adult Function Report (September 29, 2004).**  Eighteen months after she was injured, Plaintiff described her daily activities:

1.   Wake up to take my medications
2.   My companion serves me breakfast
3.   Try to sit up for 30 min. to 1 hr
     I have a severe cervical sprain
4.   Read or watch a little T.V. until my medications starts to doze me to sleep
5.   Wait for my children to come home from school
6.   Watch my children do the chores to help me
7.   Take meds again
     Watch my companion help my children with homework
     Its not a fun days
     I miss being able to do everything on my own

AR 196.[16]

Plaintiff reported difficulties with personal care stemming from difficulties in bending or reaching up or down.  Her medications caused dizziness, drowsiness, and forgetfulness, and prevented her from being able to focus and enjoy events.  Because her medications impaired her judgment, she left decisions to her partner, who took care of all her needs.  On doctors' orders, she did not lift or walk.

Because going out reminded her of how her life had changed, Plaintiff stayed at home except for medical appointments.  Nonetheless, she was able to drive.

**Third-Party Adult Function Report (September 29, 2004).**  Glover prepared a third-party report on Plaintiff's behalf.  Glover spent his days with Plaintiff, who watched television, read, ate, and sometimes went out to doctors' appointments.  He worked third shift.

Plaintiff cared for her children, shopped, helped with housework, did a little laundry, washed dishes, and prepared simple meals in the microwave.  Due to pain, she slept poorly for brief time periods.  At her doctors' direction, Plaintiff did not do house or yard work.  She could not drive.  Plaintiff was capable of handling her own financial matters in all respects.

---

[16]  In September 2004, Plaintiff's daughters were 7, 10, and 12 years old.

**Dr. Murillo.**  On December 3, 2004, agency physician Evangeline Murillo, M.D., completed a mental residual functional capacity assessment.  Murillo concluded that Plaintiff had no significant limitations except for moderate limitation in her ability to understand, remember, and carry out detailed instructions.  In the accompanying psychiatric review technique, Murillo identified Plaintiff as evincing both affective (adjustment disorder v. major depression) and personality (dependant and histrionic personality features) disorders.  Murillo opined that Plaintiff had mild functional limitations in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, and pace.  She found insufficient evidence of any episodes of decompensation.

**Dr. Ginsburg.**  On December 3, 2004, agency physician Brian Ginsburg, M.D., prepared a physical residual functional capacity assessment.  Ginsburg opined that Plaintiff could lift twenty pounds occasionally and ten pounds frequently; could stand, walk, and sit for six hours in an eight-hour work day; had unlimited ability to push and pull; could frequently climb ramps and stairs, balance, stoop, kneel, and crouch; could occasionally crawl and climb ladders, ropes, and scaffolds; and had limited ability to reach in all directions, but unlimited ability to handle, finger, and feel.  Plaintiff had no communicative, visual, or environmental limitations.  Plaintiff had postural limitations.  She should not perform heavy lifting or repeated flexion/extension movements of the spine.

**Dr. Wlasichuk.**  On December 29, 2004, Plaintiff reported to Wlasichuk that she had a seizure on December 22, 2004.  Her range of motion was flexion, 15°; extension, 15°; rotation, 20°; and bends, 20°.

**Dr. Young.**  Optometrist Victor R. Young, O.D., examined Plaintiff's vision on March 4, 2005.  Although she was slightly myopic, her vision could be corrected to 20/20.  She demonstrated slight visual accommodation problems, also correctable, possibly as a result of her injuries, pain, or medication.

**Dr. Wlasichuk.**  On March 21, 2005, Wlasichuk noted that Plaintiff was able to rotate her head almost fully.  Passive flexion/extension was 20°; rotation, 40°; and bends, 25°.

///

On December 12, 2005, Wlasichuk noted improved neck movement: flexion, 35°; extension, 25°; rotation, 45°, left and 35°, right; and full shoulder movement.  On March 24, 2006, Plaintiff reported more neck movement but complained that she was experiencing numbness and tingling.

Plaintiff reported that she went to the emergency room for an anxiety attack in the week prior to her May 12, 2006 appointment with Wlasichuk.[17]  Range of motion was shoulders, full; extension, 25°; rotation, 20°, right and 45°, left; and bends, 20°, left and 35°, right.

On June 30, 2006, Plaintiff complained that her headaches lasted longer.  Range of motion was flexion, 25°; extension, 20°; rotation, 40°; and bends, 30°.

**Residual Functional Capacity (Borrego).**  On July 17, 2006, Borrego prepared a mental assessment.  According to Borrego, since Plaintiff was assaulted in March 2003, she had been diagnosed with chronic post traumatic stress syndrome, depression, and anxiety.  Her signs and symptoms included sleep disturbance; personality change; mood disturbance; emotional lability; recurrent panic attacks; psychomotor agitation; feelings of guilt/worthlessness; difficulty thinking or concentrating; suicidal ideation or attempts; social withdrawal or isolation; blunt, flat or inappropriate affect; decreased energy; intrusive recollections of a traumatic experience; persistent irrational fears; generalized persistent anxiety; and hostility and irritability.  Borrego considered Plaintiff's prognosis to be poor to fair.

Borrego opined that Plaintiff had no impairment in remembering locations and work like procedures.  She was slightly impaired in her ability to understand, remember, and carry out short and simple instructions; ability to understand, remember, and carry out detailed instructions; to make simple work-related decisions; to interact appropriately with the public; to ask simple questions or to request assistance; to accept instructions and respond appropriately to criticism from supervisors; to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; and to set realistic goals or make plans independently of others.  Plaintiff was moderately limited in her ability to maintain attention and concentrate for extend periods. She

[17]  As previously noted, hospital records indicate that this visit was for headache and dizziness.

was markedly limited in her ability to perform activities within a schedule, maintain regular attendance, and be punctual with customary allowances; to sustain and ordinary routine without special supervision, to work in coordination within a proximity to others without being distracted by them; to complete a normal work-day and work-week without psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; to respond appropriately to changes in the work setting; to be aware of normal hazards and take appropriate precautions; and to travel to unfamiliar places or use public transportation.

Borrego stated that Plaintiff could not perform even "low stress jobs." She had not yet recovered from her physical injuries, and her psychological and emotional problems resulted in even more pain. According to Borrego, Plaintiff had marked restriction of activities of daily living; marked difficulties in maintaining social functioning; frequent deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner; and repeated episodes of deterioration or decompensation in work or work-like settings which caused her to withdraw from the situation or to experience exacerbated signs and symptoms.

**Residual Functional Capacity (Wlasichuk).** In a residual functional capacity questionnaire dated July 20, 2006, Wlasichuk diagnosed Plaintiff as experiencing chronic cervical strain, myofascial pain syndrome, upper traps, headaches, and occipital neuritis. Psychological conditions included depression, anxiety, and psychological factors affecting physical condition. Her prognosis was guarded.

Wlasichuk opined that Plaintiff's pain, fatigue, and other symptoms were sufficiently severe to frequently interfere with Plaintiff's attention and concentration. She could only maintain attention and concentration for thirty minutes at a time. Plaintiff could tolerate low stress jobs. She could sit more than two hours before needing to get up and could stand two hours before needing to sit down or walk. She did not need to be able to change positions at will. Plaintiff would need about a ten-minute break every two hours. She did not need to elevate her legs during her breaks. Plaintiff was likely to miss four days of work each month.

///

16

Plaintiff could sit, stand and walk four hours each in the course of an eight-hour work day. She could lift ten pounds occasionally and twenty pounds rarely; occasionally look down or turn her head left or right; rarely look up or hold her head in a static position; occasionally twist, stoop, and crouch; and never climb stairs or ladders.  She had significant limitations in repetitive reaching, handling, or fingering.  Plaintiff was able to use her hands to grasp, turn, or twist an object 40% of an eight-hour work day; perform fine manipulations 50% of an eight-hour  work day; and reach, including overhead, 5% of an eight-hour work day.

**Plaintiff's hearing testimony (August 7, 2006).**  At the August 7, 2006 hearing, Plaintiff testified that she last worked on March 13, 2003, the day on which she was attacked by a resident of Porterville Developmental Center.  The residents with whom Plaintiff worked were persons who had been found incompetent to stand trial for their alleged crimes.  As a result of her injuries, Plaintiff wore a neck brace for two years.  Trying to get her weakened muscles back into shape caused severe pain and headaches.  Plaintiff continued to experience flashbacks of the attacks that left her agitated and disturbed.

Plaintiff was unable to concentrate.  According to her doctors, the medications that calmed her down also destroyed her concentration.  If she attempted to stay up for more than two hours, doing things, she had severe headaches four to five times a week for six to eight hours.  Her medications left her drowsy and tired.

Plaintiff could lift and carry ten pounds, occasionally twenty pounds.  She could sit for two hours before feeling pain, largely attributable to holding up her head.  She took breaks for fifteen to thirty minutes every one-and-a-half to two hours.  About two days a week, the pain was so intense that Plaintiff remained in her room.

Plaintiff testified that she was not considered a candidate for vocational rehabilitation because she required too many medications.  In addition, she needed to be "okay" five days a week from 8:00 a.m. to 5:00 p.m., but she was not "okay" for that long a period.

**Vocational expert testimony (August 7, 2006).**  At the August 7, 2006 hearing, Judith Najarian, the vocational expert, opined that Plaintiff's previous work as a psychiatric technician was medium, skilled and SVP 6, but Plaintiff performed it as heavy.  Certified nurse's aide or

nursing assistant was medium, semiskilled and SVP 4, but Plaintiff performed her job as heavy.
Plaintiff also performed her work as a home attendant, medium, SVP 3, as heavy work.  Her work
in quality control as a carpet inspector was listed as light, semiskilled, SVP 4, but, because
Plaintiff was required to lift 60 to 80 pounds, she had performed it at the heavy level.
Supermarket bagger was medium, SVP 2, and unskilled.

For the first hypothetical question, the ALJ directed Najarian to assume a 38-year-old
individual with some college credits and Plaintiff's work experience, who has a combination of
severe impairments.  The hypothetical individual retained the residual functional capacity to lift
and carry 20 pounds occasionally and ten pounds frequently; to stand, walk, and sit for six hours;
to occasionally climb ropes, ladders and scaffold; to occasionally crawl and reach overhead; to
perform simple and repetitive tasks; to maintain attention, concentration, persistence, and pace; to
relate to and interact with others; to adapt to usual changes in work settings; and to adhere to
safety rules.  Najarian opined that such a person could not perform any of Plaintiff's prior work.
She could, however, perform light unskilled work such as copy clerk (6484 jobs in California),
office helper (20,355 jobs), and information clerk (9537 jobs).

For the second hypothetical question, the ALJ directed Najarian to assume an individual
with the same vocational parameters outlined in the first hypothetical question except the
hypothetical person had the ability to lift and carry 20 pounds rarely and ten pounds occasionally;
to occasionally look down, turn the head, twist, stoop and crouch; to stand, walk, and sit four
hours per day; to maintain attention and concentration for 30 minutes at a time.  The individual
could rarely look up or hold her head in a static position; had significant limitations in repetitive
reaching, handling, and fingering; would need to take a break for ten minutes every two hours;
and would be absent from work four days per month.  Najarian opined that such an individual
could not perform Plaintiff's prior work or any other work in the national economy.

For his final hypothetical question, the ALJ directed Najarian to assume an individual with
the same vocational parameters listed in questions one and two, with a combination of severe
impairments.  The individual retained the residual functional capacity to lift and carry 20 pounds
occasionally, ten pounds frequently; to sit two hours total; to stand one and one-half hours total.

1   The individual cannot maintain attention or concentration for two hour intervals; she would be

2   incapacitated one or two days per week; she would experience fatigue and drowsiness throughout

3   the work day; she could not relate to or interact with others; and she would have difficulty

4   maintaining attention and concentration.  Najarian opined that such an individual could not

5   perform Plaintiff's prior work or any other work in the national economy.

6       Plaintiff's attorney, Robert Christenson, directed Najarian to assume a person of the same

7   age, education, and work experience as Plaintiff.  The hypothetical individual would be markedly

8   limited in ability to perform activities within a schedule, maintain regular attendance, and be

9   punctual with customary allowances; to sustain an ordinary routine without special supervision; to

10  work in coordination within a proximity to others without being distracted by them; to complete a

11  normal work day or work week without interruption from psychologically based symptoms; and to

12  perform at a consistent pace without an unreasonable number and length of rest breaks.  Najarian

13  opined that such an individual could not perform Plaintiff's prior work or any other work in the

14  national economy.

15      Christenson then directed Najarian to assume  a person of the same age, education, and

16  work experience as Plaintiff.  The hypothetical individual would be markedly limited in activities

17  of daily living; markedly limited and with difficulties in maintaining social function; have

18  frequent deficiencies of concentration, persistence, or pace, resulting in a failure to complete tasks

19  in a timely manner.  The individual has three or more episodes of deterioration or decompensation

20  in a work or work like environment.  Najarian opined that such an individual could not perform

21  Plaintiff's prior work or any other work in the national economy.

22      **Dr. Wlasichuk.**  On August 7, 2006, the ALJ requested that Wlasichuk provide a more

23  detailed report of Plaintiff's condition and limitations.  On August 25, 2006, Wlasichuk advised

24  Judge Berry that Plaintiff was receiving conservative therapy consisting of medications.  She saw

25  Borrego every two weeks to stabilize her depression.  She was anxious and sometimes suicidal.

26  Following her injuries, Plaintiff suffered headaches three to four times per week lasting about four

27  hours.  Currently, she suffered headaches five to six times a week lasting four to six hours at a

28  time. Her strength was decreased, and she had a reduced range of movement (Neck: flexion, 25°;

extension, 15°; rotation, 20°, left and 40°, right; and neck bends, 25°; Shoulders, 130° flexion and 115° extension).

Wlasichuk opined that Plaintiff could lift and carry 15-20 pounds occasionally and 10 pounds frequently; stand or walk one hour at a time for a total of four hours daily; and sit for up to six hours daily.  She did not require assistive devices.  Functional limitations included occasional upward gaze, overhead reaching, and no forceful pushing or pulling.  Although Plaintiff was able to drive a car, she had difficulty looking over her shoulder while driving.

**Vocational expert testimony (November 16, 2006).**  At the November 16, 2006 hearing, the ALJ first directed Najarian to assume a hypothetical 34-year-old individual with some college course credits and the same work experience as Plaintiff.  The individual had a combination of severe impairments but retained the ability to occasionally carry up to fifteen to twenty pounds, and frequently carry ten pounds; to stand or walk an hour at a time for up to four hours per day; to sit a maximum of six hours per day; to occasionally gaze upward or reach overhead.  The individual could not push or pull forcefully.  Najarian opined that the individual could not perform Plaintiff's past work, but could perform unskilled sedentary work.  Examples of unskilled sedentary work include cashier (DOT No. 209.567-014; 15,724 jobs in California); clerk (DOT No. 237.367-046; (12,553 jobs in California); and assembly work (DOT No. 734.687-018; 5317 jobs in California).

Christenson directed Najarian to assume the same hypothetical individual, except that the individual would need to take unscheduled breaks for ten minutes every two hours and would likely be absent from work four days a week.  Explaining that a ten-minute break every two hours is close to a normal schedule, Najarian expressed concern at the projected absences, opining that such a person would not retain an unskilled job, but would be fired.

Christenson then directed Najarian to assume the hypothetical individual from the ALJ's hypothetical, except that the individual would be markedly limited in her ability to follow a schedule, maintain regular attendance, and be punctual within customary allowances.  Najarian replied that such an individual could not perform Plaintiff's prior work or any other work in the national economy.

Finally, Christenson directed Najarian to assume that the hypothetical individual had marked restriction of activities of daily living, marked difficulty in maintaining social functioning, and frequent deficiencies of concentration, persistence, or pace resulting in failure to complete tasks in a timely manner.  Again, Najarian replied that such an individual could not perform Plaintiff's prior work or any other work in the national economy.

**Dr. Wlasichuk.**  On November 28, 2006, Wlasichuk advised Plaintiff's attorney:

> [T]he patient may be absent up to four days per month as a result of impairment or treatment.  She may be absent up to four days per month primarily due to her cervical strain or stress.  This would only be if she had a flare-up, she would not be treated any differently than what medication she is getting currently.  As far [as] her headaches are concerned, she may have headaches, which may fluctuate up to five or six times per week.  She is also treated with medications of Zonegran.  The headaches would not interfere with her work.  She has been suffering from fatigue.  This is mostly due to her use of antidepressants.  She has been suffering from chronic fatigue as mentioned due to the antidepressants she is taking Effexor XR as well as Xanax 0.5 including Elavil at bedtime.  She may require medications of Provigil should she continue suffering from chronic fatigue.  I do not believe this would be severe enough to interfere with her attention or concentration.

AR 470.

On January 26, 2007, Wlasichuk noted that Plaintiff was unable to look over her shoulder.

**Vocational expert testimony (March 7, 2007).**  At the March 7, 2007 hearing, the ALJ posed a single question, asking the vocational expert, Thomas Dachelet, to consider a 34-year-old individual with some college credit and past relevant work that was predominately medium or heavy, skilled, semi-skilled, and unskilled work: If such an individual were to be absent four days per month, but her ability to concentrate and pay attention were not affected, could she perform Plaintiff's prior work as a psych tech, certified nursing assistant, health care attendant, quality control inspector, or grocery bagger?  Dachelet opined that no jobs in the national economy would be available to someone who was absent four days monthly.

**Adult Function Report (August 13, 2007).**  On a typical day, Plaintiff awoke, took her medication, and saw her children off to school.  Plaintiff drove her children to and from school.  She rested on and off all day, with a break for lunch.  She went out once or twice daily.  She helped feed her children dinner until her medications "kicked in" and she became tired and dizzy.  Daily living was a "slow process."

Plaintiff reported anxiety and panic disorder.  She shopped only late at night when the stores had few customers. Although her mother helped her a lot, she no longer went to family functions.  She did not get along with others.

On a good day, Plaintiff could lift fifteen to twenty pounds.  Walking was painful. Because of her medications, she had difficulty concentrating and following directions.  Because Plaintiff made too many mistakes, Glover cared for their finances.

Plaintiff remarked:

> Besides the physical pain [due] to an injury, I have developed severe and chronic sym[p]toms of depression, headaches, anxiety, and panic disorders.  My sym[p]toms are chronic and can be exacerbated by social situations.  I am on medication, and psychological treatment when needed.  I experience social withdraw[a]ls and isolation, hostility and irritability around strangers.  Also psychomotor agitation, feelings of worthlessness, difficult thinking or concentrating d[ue] to medication.  I experience intrusive recollections of a traumatic experiences.  Decreased energy d[ue] to medication.

AR 284.

**Third-Party Adult Disability Report (August 13, 2007).**  Glover reported that since her injury, Plaintiff's personality had changed.  He had become responsible for the household, including shopping and finances.  Plaintiff had no interest in cooking and did few household chores.

Because Plaintiff was up most of the night, she was tired most of the time. She had anxiety and panicked.  She was frequently dizzy, and could not pay attention or follow instructions.  Her memory had become poor. She was sometimes able to dress, bathe, and care for her hair.  She could not walk more than a few minutes at a time.

Plaintiff could not manage her own medications.  After checking that Plaintiff's illnesses, injuries, and conditions affected all the activities listed on the form, Glover scrawled, "TOO MUCH MEDS."

**Tulare County Mental Health.**  In or about October 2007, Plaintiff sought treatment from Tulare County Mental Health (TCMH), complaining that she was depressed, anxious, hyper-vigilant and fearful.  She told them that her current medical conditions were herniated discs in her

///

22

upper back, nerve damage to her neck, and seizures.  She complained of chronic pain twenty-four hours a day.  Based on the information provided, Steven Lloyd, LMFT, diagnosed:

| | | |
|---|---|---|
| Axis I: | 309.81 | Post traumatic stress disorder |
| | 296.32 | Major depression, recurrent, moderate |
| | 300.01 | Panic Disorder without agoraphobia |
| Axis II: | V71.09 | |
| Axis III: | 2 herniated discs in upper back, nerve damage to neck, seizures | |
| Axis IV: | Psycho social environment | |
| | Economic | |
| Axis V: | Current GAF:  48 | |
| | Past GAF:     45 | |

AR 598-599.[18]

Lloyd's therapy focused on desensitizing Plaintiff's anxious response to situations that reminded her of the attack, such as people walking up behind her.  On December 18, 2007, he noted, "Client expresses a desire to be better, but [has] fear of any exposure or discomfort."  AR 631.

Lloyd also counseled Plaintiff to return gradually to physical activities.  On January 2, 2008, Plaintiff complained that she was in great pain after continuing to garden after she knew she was overdoing the physical activity, which she could perform comfortably for only three hours.  Lloyd encouraged her to increase the time spent in physical exertion more gradually.

On January 9, 2008, psychiatrist Gilbert Saul prepared a psychiatric evaluation.  Saul observed that Plaintiff's long- and short-term memory were intact, despite Plaintiff's complaints of poor concentration and memory.  Her judgment was good, but her insight was only fair.  Saul diagnosed:

---

[18]   The Global Assessment of Functioning (GAF) scale may be used to report an individual's overall functioning on Axis V of the diagnosis.  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders at 32 (4th ed., Text Revision 2000) ("DSM IV TR").  It considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," excluding "impairment in functioning due to physical (or environmental) limitations."  Id. at 34.  The first description in the range indicates symptom severity; the second, level of functioning.  Id. at 32.  In the case of discordant symptom and functioning scores, the final GAF rating always reflects the worse of the ratings.  Id. at 33.
  GAF 48 is at the upper part of the range GAF 41-50, which indicates "Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment is social, occupational, or school functioning (e.g., no friends, unable to keep a job."  Id. at 34.

| Axis I: | 309.81 | Post traumatic stress disorder |
| | 296.32 | Major depression, recurrent, moderate |

Axis II:      No diagnosis, but obsessive compulsive traits are noted.

Axis III:     Two herniated discs in upper spine, nerve damage to neck, seizures and chronic pain

Axis IV:      Disabled, dependent upon family for economic help.

Axis V:       Current GAF: 50

AR 629.[19]

Saul opined:

Patient is very much in need of cognitive therapy and desensitization therapy. First and foremost she has to realize that bad things happen to good people and often no one is to blame. Next she has to stop feeling angry and resentful every time she feels a bit of discomfort and pain. She must make up her mind that she has a lot of hard work to do to desensitize herself to the trauma. This will be of much more benefit than anything medication can do.

With regards to medication she has made a relatively good response to Effexor but will need lithium or some other tactic to augment the response. Complete remission is a goal of antidepressant treatment.

AR 630.

On March 5, 2008, Plaintiff saw Saul for medication support services. Plaintiff reported to Saul that psychotherapy with Lloyd was helping her "quite a bit." Because Plaintiff did not want to make any changes in her medication, she agreed with Saul that she would continue to work with her therapist and try to increase her exercise.

On March 28, 2008, Plaintiff told Saul that she had been able to increase her walking and could now walk about three blocks around Target and Walmart.

On April 23, 2008, Plaintiff told Lloyd of difficult family issues regarding one of her daughters. Without consulting her physicians, Plaintiff had reduced her antidepressant dosage, believing that the medication interfered with her ability to deal with her daughter's problems. Her depression had increased.

---

[19]   GAF 50 is at the top of the range GAF 41-50, which indicates "Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment is social, occupational, or school functioning (e.g., no friends, unable to keep a job." *Id.* at 34.

On July 2, 2008, Plaintiff saw psychiatrist Arieh R. Whisenhunt, M.D., who provided medication support services after Saul left TCMH.  His notes focused on Plaintiff's need for continued psychotherapy and more activity outside her home.

On August 1, 2008, Lloyd noted his attempts to explore secondary gain with Plaintiff:

> Client reports that she continues to be fearful and anxious.  She reports that she became very fearful when she learned that an inmate had escaped from the hospital where she used to work.  Discussed that initial response.  Discussed tools client has been taught that would help challenge her negative self talk and help her to extinguish fear responses.  Pointed out that client is ultimately responsible for change.  Client responds with a litany of troubles, symptoms and reasons why she cannot get better.  Attempted to explore reasons why client would need to remain symptomatic.  Client not responsive to this.

AR 636.

**Dr. Nowlan.**  On September 14, 2007, internist James A. Nowlan, Jr., M.D., examined Plaintiff as the agency's consultant.  Nowlan observed that Plaintiff appeared depressed.  The range of motion of her cervical and lumbar spine were limited by pain.  Cervical motion was lateral flexion, 0-20°; chin to chest, 40°; and rotation, 0 to 60° on each side.  Lumbar motion was flexion, 0 to 70 °; extension, 0 to 20°; and lateral motion, 0 to 20°.  Motor strength was 5/5 throughout Plaintiff's upper extremities.  Nowlan diagnosed muscle strain of the neck and back, and tension headaches.  Nowlan opined:

> The claimant can be expected to be able to stand and walk for six hours during an eight-hour workday.

> The claimant can be expected to sit without limitations.

> The claimant does not require any assistive devices.

> The claimant can lift 10 pounds frequently and twenty pounds occasionally.

> The claimant has mild postural limitations.  She has no manipulative limitations.

AR 486-487.

**Dr. Izzi.**  Roger A. Izzi, Ph.D., a clinical psychologist and neuropsychologist performed a consultative psychiatric evaluation.  Plaintiff was fully oriented.  She appeared depressed and tense.  On testing, she demonstrated difficulty with delayed recall and performing serial sevens.  Izzi observed no gross indications of psychosis or schizophrenia.  Plaintiff's score on the Folstein Mini Mental State Examination (26/30) indicated mild mental impairment.  Izzi diagnosed:

Axis I:          309.81 Post traumatic stress disorder

Axis II:         799.9 Diagnosis deferred

Axis III:        General medical condition per medical specialist

Axis IV:         Psychosocial stressors: unemployment, economic problems

Axis V:          Current GAF: 55

AR 490.[20]

His functional assessment was:

Clinical interview indicates that the claimant is not having any difficulty caring for basic hygiene.  The present evaluation suggests that the claimant does appear capable of performing a simple and repetitive type task on a consistent basis over an eight-hour period.  Her ability to get along with peers or supervisors in a work-like setting may be limited due to the anxiety associated with her mood state.  Mental status examination suggests problems with short-term memory may affect her ability to perform a complex task on a consistent basis over and eight-hour period.  On a purely psychological basis, she appears capable of responding to usual work session situations regarding attendance, safety issues, and in dealing with changes in a routine work setting.

AR 491.

**Residual Functional Capacity.**  On March 27, 2008, Roger Fast, M.D. assessed Plaintiff's physical residual functional capacity.  Fast opined that Plaintiff was capable of lifting 10 pounds frequently and 20 pounds occasionally; standing or walking 6 hours in an 8 hour work day; sitting for six hours in an 8 hour workday.  She could frequently climb ramps and stairs, balance, stoop, kneel, and crouch, and occasionally crawl or climb ladders, ropes, and scaffolds.  Based on the range of motion in her neck and shoulders and 5/5 motor strength, Fast concluded that Plaintiff had unlimited ability to push and pull.  Although Plaintiff's reach was limited, she had unlimited ability to handle, finger, and feel.  Fast commented:

Dr. Wlasichuk's MSO in 08/06 was for light, except for 4 hours stand/sit.  Dr. Nowlan at CE 09/07 opines that she can do light exertional work.  Both agree that certain postural and reaching restrictions are necessary.  Great weight to Dr. Nowlan's more recent RFC.

AR 604.

---

[20]  GAF 55 is at the middle of the range GAF 51-60, which indicates "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attack or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers ." *DSM IV TR* at 34.

On March 27, 2008, Glenn K. Ikawa, M.D., prepared a mental residual functional capacity assessment.  He opined that Plaintiff had no significant limitations except for moderate limitations in her ability to understand, remember, and carry out detailed instructions.  On the psychiatric review technique, Ikawa opined that Plaintiff had mild restriction of activities of daily living and difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation.

**Dr. Wlasichuk.**  On April 7, 2008, Wlasichuk signed a note regarding Plaintiff: "No repetitive bending.  No overhead reaching. No twisting."  AR 635.  On May 16, 2008, Wlasichuk referred Plaintiff for therapy at Porterville College.  Goals were to improve general aerobic conditioning and to improve overall body strength and flexibility.

**Plaintiff's hearing testimony (September 15, 2008).**  At the September 15, 2008 hearing, Plaintiff testified that the 2003 assault:

> Caused cervical sprain, nerve damage, muscle damage, neck injury, trauma to the head, a seizure disorder, headaches real bad, nightmares, panic attacks, anxiety.  I still live with the anxiety and the panics.  It's like a shadow behind me.  I'm always watching my back.  I'm always, I can't concentrate, I'm always in fear.  The nightmares, I wake up periodically throughout the night three or four times a night.  Well, now they have me on Ambien and I can probably, if I'm lucky, get four hours of sleep, if I'm lucky.

AR 664.

Plaintiff reported suffering headaches four to six times per week for three to six hours a day.  Her headaches made her isolate herself.   Her medications included Zonisamide (for seizure disorder), Cyclobenzaprine (muscle relaxer). Darvocet (pain reliever), (Elavil) Amitryptyline (anxiety and depression), Effexor (depression and suicidal thoughts), and  Ambien (sleeping pill).  The medications caused side effects including shaking hands, sweaty palms, fatigue, tiredness, nervousness, and fidgeting.

Reaching above her head, bending over, and looking over her shoulder were painful.  Using a computer screen was painful.  Sitting upright was painful.  As a result of adaptive physical therapy, Plaintiff was able to carry fifteen pounds.  She could stand for ten or fifteen minutes before needing to sit for ten minutes.  When she sat, she needed to stand frequently since her body went numb and her legs fell asleep.  In an ordinary eight-hour day, she needed to lay

down for fifteen minutes every hour to rest her back.  On her bad days, about two days a week, she spent most of the day in bed.  When she took classes at Porterville College, she needed to leave the room every twenty to thirty minutes to walk around, then come back.  Plaintiff skipped the summer semester of college because she was suffering too many headaches.

Plaintiff did not like to be around people.  Plaintiff took Xanax[21] in class to reduce her anxiety.  She could not concentrate if others were present but could concentrate for fifteen or twenty minutes if she were alone.  Plaintiff had panic attacks daily that lasted until she took her Xanax.

**Vocational expert testimony (September 15, 2008).**  At the September 15, 2008 hearing, Dachelet testified that a nurse's aide in a nursing home was medium effort, SVP 3, semiskilled, but that, as Plaintiff performed the job, it was heavy.  The psych tech position was medium, SVP 6, skilled, also performed as heavy.  Certified nurse's assistant, is medium, SVP 3, semi skilled. The quality control work performed by Plaintiff is light, SVP 3, semiskilled.

For the first hypothetical question, the ALJ directed Dachelet to assume a hypothetical 36-year-old individual with some college credits and the same work experience as Plaintiff.  The individual had a combination of severe impairments and was able to sit, walk and stand for six hours; to occasionally climb ropes, ladders, and scaffolds; to occasionally crawl or reach overhead; to perform simple repetitive tasks; to maintain attention, concentration, persistence, and pace; to adapt to usual changes in work settings; to relate and interact with others; and to adhere to safety rules.  Dachelet testified that such a person could not perform any of Plaintiff's prior jobs, but could perform any sedentary or light unskilled work.  Such work would include such positions as bagger (census code 964; DOT No. 920687018; light; 31,574 positions in California); garment sorter (census code 896; DOT No. 222687014; light; 33,788 positions in California); and grader (census code 880; DOT No. 529665010; light; 20,708 positions in California).

*///*

---

[21] Xanax (alprazolam) is a benzodiazepine used to treat anxiety disorders and panic attacks.  Possible side effects include drowsiness, light-headedness, headache, tiredness, dizziness, irritability, talkativeness, difficulty concentrating, dry mouth, increased salivation, changes in sex drive, nausea, constipation, changes in appetite or weight, difficulty urinating, and joint pain.  www.ncbi.nih.gov/pubmedhealth/PMH0000807 (October 25, 2011).

For the second hypothetical question, the ALJ directed Dachelet to consider the same individual described in the first question, except that the individual could not repetitively bend at the waist, reach overhead, or twist.  Dachelet replied that such a person could not perform Plaintiff's prior work but could perform any sedentary job.  Sedentary unskilled jobs include ampule sealer (census code 896; DOT 559687014; 1933 positions in California); loader of semi-conductor dyes (census code 896; DOT No. 726687030; sedentary; 5406 positions available in California); and escort driver (census code 913; DOT No. 919663022; 14,742 positions in California).

For the third hypothetical question, the ALJ directed Dachelet to consider the same hypothetical individual and to further assume that he or she had the residual functional capacity to lift and carry a maximum of fifteen pounds; and to stand, walk, and sit less than four hours total.  The individual should avoid looking or gazing upward; must lie down and rest every hour for fifteen minutes; has difficulty paying attention and cannot concentrate for more than fifteen to twenty minutes at a time; and has difficulty relating to and interacting with others.  Dachelet opined that such a person could neither perform Plaintiff's prior work nor any other job available in the national economy.

Christenson directed Dachelet to assume an individual of the same age, education and work experience as Plaintiff, who frequently experiences pain, fatigue, or other symptoms severe enough to interfere with attention or concentration.  The hypothetical individual can maintain attention and concentration for thirty minutes at a time; can sit for six hours out of eight; can stand and walk four hours out of eight; needs to take unscheduled breaks for ten minutes every two hours; can rarely lift twenty pounds, occasionally lift ten pounds; can occasionally look down or turn his or her head left or right; can rarely look up or hold his or her head in a static position; has significant limitations in repetitive reaching, handling, or feeling; can use his or her fingers fifty per cent of an eight-hour day; and can reach five percent of an eight-hour day.  The hypothetical person would be absent from work about four days per month.  Dachelet opined that such a person could not perform Plaintiff's previous work or any other job in the national economy.

///

Christenson then directed Dachelet to assume that, at unscheduled times, the hypothetical person had headaches five to six times per week that last from four to six hours.  Dachelet responded that such a person could not perform Plaintiff's previous work or any other job in the national economy.

Christenson next directed Dachelet to assume that the hypothetical individual from his first question had moderate difficulties in maintaining attention, concentration, persistence, or pace.  Again, Dachelet responded that the hypothetical person could not perform Plaintiff's previous work or any other job in the national economy.

Finally, Christenson directed Dachelet to assume a hypothetical person of the same age, education, and work experience as Plaintiff whose ability to get along with peers or supervisors in a work-like setting may be limited due to anxiety associated with is or her mood state.  The individual's mental status examination suggest that he or she has problems with short-term memory that may affect his or her ability to perform complex tasks on a consistent basis over an eight-hour period.  Dachelet declined to offer an opinion, stating that the question was not objective enough.

## II.    Legal Standards

To qualify for benefits, a claimant must establish that he or she is unable to engage in substantial gainful activity because of a medically determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c (a)(3)(A).  A claimant must demonstrate a physical or mental impairment of such severity that he or she is not only unable to do his or her previous work, but cannot, considering age, education, and work experience, engage in any other substantial gainful work existing in the national economy.  *Quang Van Han v. Bowen*, 882 F.2d 1453, 1456 (9th Cir. 1989).

To encourage uniformity in decision making, the Commissioner has promulgated regulations prescribing a five-step sequential process for evaluating an alleged disability.  20 C.F.R. §§ 404.1520 (a)-(f); 416.920 (a)-(f).  The process requires consideration of the following questions:

///

| | | |
|---|---|---|
| Step one: | Is the claimant engaging in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two. | |
| Step two: | Does the claimant have a "severe" impairment?  If so, proceed to step three.  If not, then a finding of not disabled is appropriate. | |
| Step three: | Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1?  If so, the claimant is automatically determined disabled.  If not, proceed to step four. | |
| Step four: | Is the claimant capable of performing his past work?  If so, the claimant is not disabled.  If not, proceed to step five. | |
| Step five: | Does the claimant have the residual functional capacity to perform any other work?  If so, the claimant is not disabled.  If not, the claimant is disabled. | |

*Lester v. Chater*, 81 F.3d 821, 828 n. 5 (9th Cir. 1995).

The ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of March 13, 2003.  She had three severe impairments: myofascial strain, headaches, and post traumatic stress disorder.  Because Plaintiff's seizure disorder was adequately controlled by medication, the ALJ considered it to be a non-severe impairment.  None of Plaintiff's impairments met or equaled the requirements of a listed impairment.

Plaintiff retained the residual functional capacity to lift and carry twenty pounds occasionally and ten pounds frequently; to stand, walk, and sit for up to six hours each in an eight-hour day; and to crawl, reach overhead, and climb ropes, ladders, and scaffolds occasionally; to perform simple repetetive tasks; to maintain attention, concentration, persistence, and pace; to relate to and interact with others; to adapt to usual changes in work settings; and to adhere to safety rules. She was unable to repetitively bend or twist.  Because of her impairments, Plaintiff was unable to perform her past relevant work.  Despite her impairments, however, Plaintiff had residual functional capacity to perform jobs that exist in significant numbers in the national economy.

**III.    Scope of Review**

Congress has provided a limited scope of judicial review of the Commissioner's decision to deny benefits under the Act.  In reviewing findings of fact with respect to such determinations, a court must determine whether substantial evidence supports the Commissioner's decision.  42

1  U.S.C. § 405(g).  Substantial evidence means "more than a mere scintilla" (*Richardson v. Perales*,

2  402 U.S. 389, 402 (1971)), but less than a preponderance.  *Sorenson v. Weinberger*, 514 F.2d

3  1112, 1119 n. 10 (9th Cir. 1975).  It is "such relevant evidence as a reasonable mind might accept

4  as adequate to support a conclusion."  *Richardson*, 402 U.S. at 401.  The record as a whole must

5  be considered, weighing both the evidence that supports and the evidence that detracts from the

6  Commissioner's decision.  *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).  In weighing the

7  evidence and making findings, the Commissioner must apply the proper legal standards.  *See, e.g.,*

8  *Burkhart v. Bowen*, 856 F.2d 1335, 1338 (9th Cir. 1988).  This Court must uphold the ALJ's

9  determination that the claimant is not disabled if the ALJ applied the proper legal standards, and if

10  the ALJ's findings are supported by substantial evidence.  *See Sanchez v. Secretary of Health and*

11  *Human Services*, 812 F.2d 509, 510 (9th Cir. 1987).

12  **IV.    Plaintiff's Credibility**

13        Plaintiff's final contention is that the ALJ erred in concluding that her testimony lacked

14  credibility.  Because Plaintiff's credibility is relevant to the evaluation of several of the physicians

15  who treated, examined, and opined on her residual functional capacity, the Court will address this

16  issue first.

17        An ALJ is not "required to believe every allegation of disabling pain" or other non-

18  exertional requirement.  *Orn v. Astrue*, 495 F.3d 625, 635 (9th Cir. 2007), *quoting Fair v. Bowen*,

19  885 F.2d 597, 603 (9th Cir. 1989).  But if he or she decides to reject a claimant's pain testimony

20  after a medical impairment has been established, the ALJ must make specific findings assessing

21  the credibility of the claimant's subjective complaints.  *Ceguerra v. Secretary of Health and*

22  *Human Services*, 933 F.2d 735, 738 (9th Cir. 1991). "[T]he ALJ must identify what testimony is

23  not credible and what evidence undermines the claimant's complaints."  *Lester*, 81 F.3d at 834,

24  *quoting Varney v. Secretary of Health and Human Services*, 846 F.2d 581, 584 (9th Cir. 1988).  He

25  or she must set forth specific reasons for rejecting the claim, explaining why the testimony is

26  unpersuasive.  *Orn*, 495 F.3d at 635.  *See also Robbins v. Social Security Administration*, 466

27  F.3d 880, 885 (9th Cir. 2006).  The credibility findings must be "sufficiently specific to permit the

28  ///

court to conclude that the ALJ did not arbitrarily discredit claimant's testimony." *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002).

When weighing a claimant's credibility, the ALJ may consider the claimant's reputation for truthfulness, inconsistencies in claimant's testimony or between her testimony and conduct, claimant's daily activities, claimant's work record, and testimony from physicians and third parties about the nature, severity and effect of claimant's claimed symptoms. *Light v. Social Security Administration*, 119 F.3d 789, 792 (9th Cir. 1997). The ALJ may consider "(1) ordinary techniques of credibility evaluation, such as claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities." *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008), *quoting Smolen v. Chater*, 80 F.3d 1273 (9th Cir. 1996). If the ALJ's finding is supported by substantial evidence, the Court may not second-guess his or her decision. *Thomas*, 278 F.3d at 959.

The Ninth Circuit has summarized the applicable standard:

> [T]o discredit a claimant's testimony when a medical impairment has been established, the ALJ must provide "'specific cogent reasons for the disbelief.'" *Morgan*, 169 F.3d [595,] 599 [9th Cir. 1999] (quoting *Lester*, 81 F.3d at 834). The ALJ must "cit[e] the reasons why the [claimant's] testimony is unpersuasive." *Id.* Where, as here, the ALJ did not find "affirmative evidence" that the claimant was a malingerer, those "reasons for rejecting the claimant's testimony must be clear and convincing." *Id.* Social Security Administration rulings specify the proper bases for rejection of a claimant's testimony . . . An ALJ's decision to reject a claimant's testimony cannot be supported by reasons that do not comport with the agency's rules. *See* 67 Fed.Reg. at 57860 ("Although Social Security Rulings do not have the same force and effect as the statute or regulations, they are binding on all components of the Social Security Administration, . . . and are to be relied upon as precedent in adjudicating cases."); *see Daniels v. Apfel*, 154 F.3d 1129, 1131 (10th Cir. 1998) (concluding the ALJ's decision at step three of the disability determination was contrary to agency rulings and therefore warranted remand). Factors that an ALJ may consider in weighing a claimant's credibility include reputation for truthfulness, inconsistencies in testimony or between testimony and conduct, daily activities, and "unexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment." *Fair*, 885 F.2d at 603; *see also Thomas*, 278 F.3d at 958-59.

*Orn*, 495 F.3d at 635.

///

Plaintiff argues that the ALJ failed to give clear and convincing reasons for finding her not credible. The Commissioner and this Court disagree. The ALJ provided a detailed discussion of his reasoning in concluding that Plaintiff was not credible:

> The claimant testified at the hearing to severe symptoms and limitations, but her testimony was not persuasive or convincing. The claimant testified that she has panic attacks, anxiety, headaches, lack of concentration, nightmares, physical injuries, and seizures. She described her symptoms as shaking of the hands, fatigue, nervousness, fidgeting, and sweating palms. She stated she has headaches four to six times a week that last three to six hours a day. She said it is painful for her to look up, bend at the waist, or reach above her head, and that her children have to tie her shoes. The claimant testified that she turns her whole body to see to the side and uses her mirrors a lot. She stated she is able to lift and carry 15 pounds, stand for ten to 15 minutes, and takes 15-minute rest breaks every hour. She said she stays in bed two days of the week. The claimant testified that she stands up every 20 to 30 minutes during a college Spanish class, and that she went to school to help her get back into society. She stated she get[s] panic attacks once a day and is afraid if someone walks behind her. She said she can concentrate for 15 to 20 minutes if she is alone. The claimant testified that she is always looking around to make sure no one is going to attack her. She said she had three or four jobs in 2003, but she now lives with anxiety and depression.

> After careful consideration of the evidence, I find claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

> The claimant testified that she is severely limited in her physical activity, but told her counselor, Mr. Lloyd, in January 2008 that she had worked in the yard and could work about three hours without harm. To the extent the claimant alleges chronic severe pain which virtually incapacitates her, I do not find her testimony credible or supported by the medical record. She has receiv[ed] only conservative measures of treatment. The claimant has not been treated with the use of a TENS unit nor has she been referred to a pain clinic or a pain specialist, and she is not being considered as a surgical candidate and has not received steroid injections. The claimant does not ambulate with an assistive device. Since the injury, she has required no hospital or emergency room care for her neck pain. She went to the emergency room in April 2005 for headaches and dizziness, but removed her own IV and left against medical advice after receiving an injection of Toradol. While she alleges she was almost nonfunctional at both hearings, these complaints and restrictions were uncorroborated by the medical treatment to date. If the claimant restricts herself to the sedentary to light level of exertion with limitations as discussed above, then her overall symptoms appear to be controllable and within tolerable limits. Also diminishing claimant's credibility under SSR 96-7p, she engages in a wide range of activities of daily living, including attending college classes and doing the requisite homework, which is not consistent with her claim of total disability. Additionally, the claimant has a driver's license without restriction and is responsible for three children. Other evidence diminishes claimant's credibility. The claimant told Mr. Lloyd in October 2007 that her ex-husband was very supportive, and they had 50/50 custody of the three children. In January 2008, the claimant told Dr. Saul that she had three daughters from three different fathers, and they all paid support. However, she told Mr. Lloyd in April

34

2008 that the father of her eldest daughter had not paid support or seen the girl for some time, but had filed for custody. The claimant's therapist, Steven Lloyd, noted in June 2008 that the claimant was focused on possible secondary gain. In August 2008, he mentioned that the plan was to continue to explore secondary gain. If the claimant's therapist has reason to suspect the claimant is pursuing her treatment for secondary gain, I find that diminishes her credibility.

Because of the lack of objective evidence to support her allegations, and because of the inconsistencies in the record and testimony, I give little weight to the claimant's subjective complaints.

AR 27-28 (*citations to administrative exhibits omitted*).

The administrative record is replete with additional inconsistencies, many of which bear damning witness to Plaintiff's lack of credibility. Although Plaintiff testified that she needed to use a cervical collar for two years, Wlasichuk's note of June 16, 2003, three months after her injury, appears to register his surprise that she was still wearing it and records his direction that she wean herself off it. A month later, Plaintiff was still wearing the collar five-sixths of the time despite Wlasichuk's directions. Plaintiff claimed that crowds at Walmart made her too anxious to shop there, but she told therapist Lloyd that she had increased her exercise by walking around Walmart and Target.

Contrary to Plaintiff's testimony that she was too impaired and required too many drugs to be a candidate for rehabilitation services, Drs. Newton and Whyman both opined that Plaintiff was capable of rehabilitation services and should be encouraged to use them.

Psychiatrist Whyman euphemistically noted that Plaintiff's account of her condition was "modestly compromised." Most importantly, Plaintiff "ma[de] clear that she [was] not about to take some low-paying job." AR 327. Whyman suspected that Plaintiff never intended to return to work.

Testing administered by Whyman and objectively analyzed by Zampardi revealed that Plaintiff was likely over-reporting the extent and severity of her psychological problems, and exaggerating her emotional distress. Zampardi's report also warned that test results showing severe depression were the product of a test that could easily be manipulated.

Shortly after the first administrative hearing, at which Borrego's qualifications were questioned, Plaintiff sought treatment at TCMH, telling them that she was in constant, chronic

pain from herniated discs and nerve damage in her neck.  Nothing in Plaintiff's medical records supports a claim of herniated discs or nerve damage.  Dr. Saul's testing revealed that, despite Plaintiff's claims, her long- and short-term memory were intact.  Addressing the issue of secondary gains motivating Plaintiff's pursuing therapy, Lloyd noted that Plaintiff was not willing to discuss the reasons why she needed to remain symptomatic.

For the first time in this appeal, the Commissioner suggests that Plaintiff was clearly malingering.  The ALJ not having addressed below whether Plaintiff might be malingering, this Court need not address that contention now.  Substantial evidence supported the ALJ's conclusion that Plaintiff's testimony lacked credibility and was entitled to little weight.  Nothing more is required.

**V.    Physicians' Opinions**

Plaintiff contends that the ALJ erred in failing to adopt the opinions of Wlasichuk, Borrego, and the treating professionals at TCMH, and by adopting Izzi's opinion despite its inconsistency with other portions of the hearing decision.  The Commissioner counters that the ALJ acted appropriately and that the hearing decision was supported by substantial evidence.

**A.    Evaluation of Physicians' Opinions, In General**

Physicians render two types of opinions in disability cases: (1) medical, clinical opinions regarding the nature of the claimant's impairments and (2) opinions on the claimant's ability to perform work.  *See Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998).  An ALJ is "not bound by an expert medical opinion on the ultimate question of disability." *Tomasetti*, 533 F.3d at 1041; S. S. R. 96-5p.  The regulations provide that medical opinions be evaluated by considering (1) the examining relationship; (2) the treatment relationship, including (a) the length of the treatment relationship or frequency of examination, and the (b) nature and extent of the treatment relationship; (3) supportability; (4) consistency; (5) specialization; and (6) other factors that support or contradict a medical opinion.  28 C.F.R. § 404.1527(d).

Three types of physicians may offer opinions in social security cases: "(1) those who treat[ed] the claimant (treating physicians); (2) those who examine[d] but d[id] not treat the claimant (examining physicians); and (3) those who neither examine[d] nor treat[ed] the claimant

1  (nonexamining physicians)." *Lester*, 81 F.3d at 830.  A treating physician's opinion is generally

2  entitled to more weight than the opinion of a doctor who examined but did not treat the claimant,

3  and an examining physician's opinion is generally entitled to more weight than that of a non-

4  examining physician. *Id.*  The Social Security Administration favors the opinion of a treating

5  physician over that of nontreating physicians. 20 C.F.R. § 404.1527; *Orn*, 495 F.3d at 631.  A

6  treating physician is employed to cure and has a greater opportunity to know and observe the

7  patient. *Sprague v. Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987).  Nonetheless, a treating

8  physician's opinion is not conclusive as to either a physical condition or the ultimate issue of

9  disability. *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).

10       Once a court has considered the source of a medical opinion, it considers whether the

11  Commissioner properly rejected a medical opinion by assessing whether (1) contradictory

12  opinions are in the record; and (2) clinical findings support the opinions.  The ALJ may reject the

13  uncontradicted opinion of a treating or examining medical physician only for clear and convincing

14  reasons supported by substantial evidence in the record.  *Lester*, 81 F.3d at 831.  Even though the

15  treating physician's opinion is generally given greater weight, when it is contradicted by an

16  examining physician's opinion that is supported by different clinical findings the ALJ may resolve

17  the conflict.  *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995).  The ALJ must set forth a

18  detailed and thorough factual summary, address conflicting clinical evidence, interpret the

19  evidence and make a finding.  *Magallanes*, 881 F.2d at 751-55.  Without specific and legitimate

20  reasons to reject the opinion, the ALJ must defer to the treating or examining professional.

21  *Lester*, 81 F.3d at 830-31.  The ALJ need not give weight to a conclusory opinion supported by

22  minimal clinical findings.  *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999); *Magallanes*, 881

23  F.2d at 751.

24       Although an ALJ is not bound by opinions rendered by a plaintiff's physicians regarding

25  the ultimate issue of disability, he or she cannot reject them out of hand, but must set forth clear

26  and convincing reasons for rejecting them.  *Matthews v. Shalala*, 10 F.3d 678, 680 (9th Cir. 1993).

27  The ALJ must tie the objective factors or the record as a whole to the opinions and findings that

28  he or she rejects. *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir. 1988).

### B.      Dr. Wlasichuk

Plaintiff first contends that the ALJ erred in rejecting Dr. Wlasichuk's opinion of her residual functional capacity since, as her treating physician, his opinion was entitled to deference. The Commissioner responds that the ALJ properly favored Nowlan's opinion and gave Wlasichuk's opinion little weight since it was inconsistent with other substantial evidence.  In its reading of the hearing decision, the Court finds that the ALJ gave weight to both opinions, finding them consistent except for limitations on standing and walking.  Accordingly, he concluded that Plaintiff was capable of "at least sedentary work."

As discussed above, the ALJ's role is to resolve any conflict between the opinions of treating and examining physicians.  *Andrews*, 53 F.3d at 1041.  The ALJ accomplishes this by setting forth a detailed and thorough factual summary, addressing conflicting clinical evidence, interpreting the evidence, and making a finding.  *Magallanes*, 881 F.2d at 751-55.  The ALJ must tie the objective factors or the record as a whole to the opinions and findings that he or she rejects.  *Embrey*, 849 F.2d at 422.

In a detailed and thoughtful evaluation of the various physicians' opinions, the ALJ first compared and contrasted Wlasichuk's opinion to that of Newton, who performed a neurological examination as an agreed medical examiner for Plaintiff's workers' compensation claim.  The ALJ favored Newton's opinion that Plaintiff was capable of performing other work since it was consistent with objective medical evidence that indicated the Plaintiff had incurred only mild cervical spine disease.  Although Newton found that Plaintiff's spinal motion was reduced by about one-third, that she was incapable of heavy lifting and repeated flexion/extension movements of her cervical spine, and that she believed that she was unemployable, he opined that she was a candidate for vocational rehabilitation on a physical and psychological basis.

In contrast, the ALJ observed, Wlasichuk completed a fill-in-the-blanks, check-blocks form on which he set forth a variety of limitations that would prevent any substantial gainful activity.  Wlasichuk responded to the ALJ's request for clarification with more specific information on Plaintiff's headaches, range of motion, and motor strength.  He stated he provided conservative treatment with specific medications.  Although his examination of

38

Plaintiff's neck revealed diffuse muscle spasm and multiple trigger points, reflexes and sensation were normal, despite Plaintiff's claims to the contrary.  Plaintiff's upper body strength was 4+/5.  Wlasichuk reported that Plaintiff continued to experience headaches for four to six hours five or six times a week.  Wlasichuk equivocated, stating that he "felt" that Plaintiff could carry up to 15-20 pounds occasionally; lift and carry ten pounds frequently; stand and/or walk up to an hour at a time for up to four total hours per day; sit up to six hours per day; and did not require any assistive device.  She could occasionally gaze upward and reach overhead, but could perform no forceful pushing or pulling.

The ALJ found that Wlasichuk continued to equivocate in his November 28, 2006 letter, in which he stated that Plaintiff *may be absent* up to four days per month if she experienced a flare-up but that, even if Plaintiff's condition worsened, her treatment would not change.  Although he continued to report that Plaintiff's headaches might fluctuate to as many as five or six per week, Wlasichik described the headaches as "moderate" and usually controlled by Zonergan, and opined that they would not interfere with Plaintiff's work.  Finally, although Wlasichuk did not believe that Plaintiff's chronic fatigue was so severe that it would interfere with her work, he attributed the fatigue to Plaintiff's antidepressants and suggested that she could take Provigil[22] if her chronic fatigue became a problem.  The ALJ interpreted Wlasichuk's opinions as indicating that Plaintiff was capable of performing "a narrow range of light work or a wide range of sedentary work."  AR 24.  The ALJ opined that Wlasichuk's opinion was consistent with the "minimal amount of objective evidence."  AR 24.

Based on Plaintiff's reports of constant neck pain and headaches that were not helped by medication, and on his findings that Plaintiff had normal strength, sensation, and reflexes despite a limited range of cervical and lumbar motion, Nowlan diagnosed Plaintiff as having a neck sprain and tension headaches.  He opined that Plaintiff was capable of lifting and carrying twenty pounds occasionally and ten pounds frequently; standing and walking for six hours; and sitting without limitation.  Despite "mild postural limitations," Plaintiff had no manipulative restrictions.

---

[22]  Provigil (modafinil) is a wakefulness producing agent used to treat excessive sleepiness.  www.ncbi.nlm.nih.gov/pubmedhealth/PMH0000196 (October 31, 2011).

1    The ALJ also found the opinions of Newton, Wlasichuk, and Nowlan to be consistent with

2  the opinions of the medical consultants employed by the state agency.

3    The consistency of Newton's, Nowlan's, and Wlasichuk's opinions is apparent from the

4  record itself.  The ALJ observed, "[T]here is no objective evidence to show the claimant is not

5  capable of at least sedentary work."  AR 24.  Because the ALJ's determination of Plaintiff's

6  residual functional capacity was consistent with both doctors and was supported by the objective

7  evidence in the record (as contrasted with Plaintiff's subjective reports), he did not err by failing

8  to adopt Wlasichuk's opinion.

9    **C.    Dr. Borrego**

10    Plaintiff contends that (1) the ALJ should have treated Borrego as an acceptable medical

11  source and considered his opinion, and (2) should have adopted Borrego's opinion as that of a

12  treating physician.  The Commissioner reiterates that the regulations do not include clinical social

13  workers as acceptable medical sources and that, in any event, Borrego's opinions were

14  conclusory, unexplained, and unsupported by objective evidence.  The Court agrees with the

15  Commissioner.

16    Acceptable medical sources include licensed physicians and licensed or certified

17  psychologists, as well as licensed optometrists, licensed podiatrists, and qualified speech-language

18  pathologists when their opinions are relevant to the claimant's disability.  20 C.F.R. §§

19  404.1513(a); 416.913(a).  The Commissioner may also use evidence from other non-medical

20  sources to show the severity of the claimant's impairment(s) and the impairments' effect on the

21  claimant's ability to work.  20 C.F.R. § 404.1513(d)(4); 416.913(d)(4).  The regulations do not

22  recognize as an acceptable medical source a licensed clinical social worker, even one who has

23  completed a doctoral program as Borrego did.  *See* Revised Medical Criteria for Evaluating

24  Mental Disorders and Traumatic Brain Injury, 65 Fed.Reg. 50746-01 (August 21, 2000) (noting

25  that social workers are not included among appropriate medical sources, although information

26  provided by social workers as "other sources" may be valuable in determining the existence of a

27  claimant's mental impairment).

28  ///

1    The ALJ discussed Borrego's opinion in detail, as he discussed the opinions of Whyman,

2    Izzi, and Saul.  Although the agency record indicates that the ALJ had questioned Borrego's

3    qualification as an acceptable medical source at or before the first hearing, the ALJ did not

4    consider Borrego's professional status in the hearing decision, but found that Borrego's opinions

5    were unsupported by objective or clinical evidence and inconsistent with the clinical observations

6    and test results set forth in the other specialists' reports.  Although the opinion of a treating

7    physician is generally given greater weight than that of an examining or nonexamining physician,

8    the Ninth Circuit has repeatedly observed that his or her opinion is not conclusive and that an ALJ

9    may reject the opinion of any physician that is conclusory, brief, or unsupported by objective or

10   clinical findings.  *See e.g., Batson v. Commissioner of Social Security Admin.*, 359 F.3d 1190,

11   1195 (9th Cir. 2004); *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th cir. 2001); *Matney v.*

12   *Sullivan*, 981 F.2d 1016, 1019-20 (9th Cir. 1992).

13   The ALJ correctly gave little weight to Borrego's opinions on Plaintiff's residual

14   functional capacity because they were unsupported by medical or psychological findings.  That

15   Borrego's opinions would lack support was largely a foregone conclusion, since Borrego's

16   treatment notes were repetetive and perfunctory, consisting largely of his repeating Plaintiff's

17   initial diagnosis, then confirming her presence at the treatment session without articulating

18   specifics of Plaintiff's condition or the nature of the therapeutic session on the date in question.

19   Simply put, Borrego did not make a record of his treatment of Plaintiff that could be consulted to

20   support his opinions of her remaining work abilities.

21   Nor did Borrego articulate any reasoning to support his opinions on the "check-box, fill-

22   in-the blank forms" on which he offered his opinion.  These omissions were fatal to Borrego's

23   opinions, which were largely inconsistent with the more carefully documented opinions of the

24   other mental health professionals and with the results of the objective tests administered to

25   Plaintiff.  *See Crane v. Shalala*, 76 F.3d 251, 253 (9th Cir. 1996) (affirming ALJ's rejection of

26   check-off forms that failed to explain the basis of the psychologist's opinions); *Murray v. Heckler*,

27   722 F.2d 499, 501 (9th Cir. 1983) (finding individualized medical opinions preferable to check-off

28   reports).  In particular, the ALJ questioned Borrego's claims that Plaintiff had experienced three

1   episodes of decompensation since none were documented anywhere in the administrative record,

2   and his unsupported opinion that Plaintiff was unable to get along with co-workers.

3          The ALJ did not err in giving Borrego's opinions little weight.

4          **D.    <u>Dr. Izzi</u>**

5          Plaintiff contends that the ALJ erred in finding that Plaintiff can relate to and interact with

6   others even though he gave significant weight to Izzi's opinion that Plaintiff's ability to get along

7   with supervisors or peers may be limited by anxiety.  The Commissioner responds that the ALJ

8   appropriately resolved ambiguities in the evidence.

9          The ALJ considered Izzi's opinion as part of a detailed analysis of the opinions offered by

10  three mental health professionals, Whyman, Izzi, and Borrego, and of Saul's treatment records .

11  The ALJ gave substantial weight to Whyman's and Izzi's opinions, emphasizing both their

12  superior credentials and their administration of objective testing measures.  Apparently

13  considering the analysis of professional opinions to be an all or nothing proposition, Plaintiff

14  appears to argue that an ALJ must accept or reject an expert opinion as a whole.  He misconstrues

15  the process.  When an expert opinion that is otherwise worthy of substantial deference includes an

16  inconsistent or equivocal statement, such as Izzi's opinion that "[Plaintiff's] ability to get along

17  with peers or supervisors in a work-like setting *may be limited* due to anxiety associated with her

18  mood state," ( AR 491 (*emphasis added*)) the ALJ is required to resolve the uncertainty expressed

19  in the evidence.  *Tomasetti*, 533 F.3d at 1041-42.  The ALJ properly did so here.

20         **E.    <u>Dr. Saul</u>**

21         Finally, Plaintiff contends that the ALJ erred in not adopting Saul's opinion finding that

22  Plaintiff had post traumatic stress disorder and major depression with a GAF of 50.  Her argument

23  confuses the diagnosis set forth in Saul's treatment notes with the other mental health

24  professionals' opinions on Plaintiff's ability to perform work.  *See Reddick*, 157 F.3d at 725.

25  Saul's diagnosis was prepared to identify Plaintiff's mental health impairments as part of her

26  ongoing treatment at TCMH, not to offer an opinion on her residual functional capacity.

27         The GAF score estimates Saul's opinion of Plaintiff's psychological, social, and

28  occupational function in the context of his initial evaluation of January 9, 2008.  It was Saul's

rough estimate of her overall functioning for the limited purpose of defining her need for mental health treatment.  *Vargas v. Lambert*, 159 F.3d 1161, 1164 (9th Cir. 1998).  In its 2001 review of the regulations addressing mental disorders and traumatic brain injury, the Social Security Administration rejected the use of a claimant's GAF score in the evaluation of his or her disability, stating, "[The GAF score] does not have a direct correlation to the severity requirements in our mental disorders listings."  Revised Medical Criteria for Evaluating Mental Disorders and Traumatic Brain Injury, 65 Fed.Reg. 50746-01 (August 21, 2000).

The ALJ did not err in failing to incorporate Plaintiff's GAF score into his analysis of her residual functional capacity.

**IV.   Conclusion and Order**

For the reasons discussed above, this Court hereby AFFIRMS the agency's determination to deny Plaintiff disability benefits.  The Clerk of Court is directed to enter judgment for Defendant Michael J. Astrue, Commissioner of Social Security.

IT IS SO ORDERED.

**Dated:    November 15, 2011**                    /s/ Sandra M. Snyder
                                   UNITED STATES MAGISTRATE JUDGE